Next is called for oral argument is people versus Eichermann. Is that correct? Counsel, you may proceed whenever you're ready. May it please the court, I'm Eddie Unsel for Mark Eichermann, the defendant herein. There's three central issues to this. The defendant, Mark Eichermann, was charged by I believe by information originally with four counts, among other things. The principal issue here is the four counts of aggravated DUI for two deaths that occurred. And the counts are that he drove his vehicle while impaired under the influence of alcohol and also that he drove his vehicle in excess of .08. The brief is broken down into three issues. It is the finding by the trial court as to the .08 alcohol. And then it is broken down as to was the defendant, the drinking the proximate cause of this accident. And then whether or not if all those things being true, then did the court abuse his discretion in failing to find extraordinary circumstances which existed under the statute. Originally, I was going to base most of my argument as to the finding of the court as to the .08. As this court will review the record, I probably did a less than stellar job in the cross-examination of Dr. Wong and trying to figure out all the mathematics on all the absorption rates and all the things that go in in determining and in analyzing someone's blood alcohol under the reverse extrapolation method. The other man that did this brief did a much better job, Attorney Kelly. So as far as the mathematics in that argument aspect of it, I'm going to leave that. But I just want to draw the court's attention that this was a stipulation in this bench trial. And the stipulation most critical to this aspect of the argument was that it was stipulated that should the Secretary of State police, the Illinois State police agent be called to testify, the one who examined the blood sample would testify that it was done in a scientific method susceptible to render a result of a .0194 as we round it off to a .02. So we start with that premise. And that blood alcohol, that blood was drawn ten hours post the accident. And it was the .02. Now, in trial, it was argued and it was brought to the court's attention two zero tolerance statutes that exist. One was the federal aviation. The other one is our own statute as to the commercial drivers. And basically it's such that we tolerate no drinking when you're driving a commercial vehicle or, of course, flying an airplane. This was a record, is that correct? This was in record. And the judge summarily dismissed it. We don't want to hear this. Right. But the argument on that is when you look back to the stipulation as to a .02, you take a look at these similar statutes that deal with blood alcohol and no tolerance of it, the statutes say that anything of a .04 or greater. Now, why is that? .01, .02, .03. That is found in a commercial driver. There's no tolerance. Why is that? The reason is that it very well could be implied that the legislative intent is because of the intrinsic biological nature of the alcohol concentration is such that you have to have a minimum threshold. By the same argument, Dr. Wong took this .02 and extrapolated a .20 blood alcohol. There was no eyewitness evidence. And the evidence at trial at best had the defendant drinking two to three drinks. I thought there was evidence that he always had a drink in his hand. The one person, that's correct, that the evidence was there was two people who played pool with him, Mary Sloan, and it wasn't Gary Poss, but it was the other individual that was in the pool. And he stated, on direct examination, did you see Mr. Eichmann with a drink in his hand all the time that he was playing pool? Yes, I did. On cross-examination, did you see him by hand? No. Do you know what he was drinking? Well, no, it was something with soda in it. So all you can say is that he was holding a drink while he was playing pool. But then he went to the second tavern, and the guy sitting there, I thought the tavern owner there, the tavern was being, there was an action against them for a dram shop probably? Pending? Was there a pending action? It may have been already been settled. Oh, it's okay. Yes, yes. And he said that he was not really, really intoxicated or something. Well, I don't know. Yes, he did. He said something to that effect. He said he was within six feet of the defendant. Could you tell he'd been drinking? He asked. I assumed that he'd been drinking. I know he had one drink, and my question was on the video. But without problem, he said, look, he wasn't over-intoxicated for sure, and I would assert that. Was the term over-intoxicated? That's what he said, overly intoxicated. Okay. Yes, and that was a Mark Edel had testified to that. So I guess you can say that he did say, yes, he had been drinking, because obviously he watched the video, and he knew he had a drink at this bar, and he couldn't have denied that. But he went ahead and tried to qualify just saying that. And arguably, you could say it was a self-serving statement. He was not overly intoxicated. I think more importantly, in the appellee's brief, and it starts out by saying that the factual recitation in the appellant's brief was self-serving, a conclusion to that, I disagree with that, but I would say that the factual recitation in counsel's brief for the appellee was 99% correct. It was very good. It was a very well-written brief. The only misstatement that I've seen was in the reason that this is important is because it said that he left the scene at a high rate of speed. That's not in there. What is in there is that there was one witness that said that he left the scene and the tow truck was bouncing going over the railroad tracks. Right. That's correct. Now, that's after the front end was off the truck? With no lights at night? No. And no illumination? No. No illumination. I will get to that on an approximate cost point. Okay. But my argument as to the finding by the chiropractor as to the .08, I understand that retrograde extrapolation has been accepted in various courts across the nation and has not been accepted, but particularly in Illinois it has, and it's never been subject to a fraud scheme. Should that have been done? Maybe. In hindsight, it's 20-20. But when you have it applied in this way, the analysis period, you have an expert who comes in and says we drew blood 10 hours later to .02. You have two absolutely zero tolerance statutes that basically forgive you for .02 because of the intrinsic biological condition that could contribute to that. That is what he finds, and he uses no absorption rate, no elimination rate. He uses nothing other than a .018 extrapolation, and he adds that for every hour. So at 10 hours, he comes up with .18, and added to the .02 that was in the system, he comes up with a .12. Of course, it took 10 hours because he wouldn't come out of his house. As counsel very eloquently said, he stayed in his trailer, That's correct. He initiated the cause. Should he benefit from that because of the 10 hours? We're talking about an analysis as to blood alcohol. You can't factor in his delay. But what you do have, the legislature has punished people. Leaving the scene of an accident when there is great bodily harm or death is much more serious than anything else. But we can't decide whether the retrograde extrapolation is good or bad because it's allowed, right? No, you certainly can't. How else are you going to do it when there's this time frame, which is the only way that they could The time frame is everything, Your Honor. The time frame, the retrograde extrapolation, and if you read the transcript, and read the cross-examination, and certainly read the cases that were cited, particularly the case out of Texas, the Maddox case, which is the best dissertation on this. The state says it's an Illinois case that we should rely upon, so we shouldn't even take the test. Absolutely. Because it discusses a good will, and I think that the farther away that you get from the event, the less reliable is the science, and I think that that's in this record, and I think that that's clear. But let's take a look at the impairment. At best, you have two to three drinks. You have the fellow, 12-7. Well, you always have drinks. There is no evidence as to how many drinks, other than what the other two girls said. And I think what you need to look at is what don't you have. You don't have any of the servers called. You don't have any of the bartenders. You don't have any of the people that would have the direct knowledge as to how many drinks they served him and what kind of drinks. You know in a double homicide, those people were talking if they weren't called. It's not my burden. They weren't called for a reason. If he was a .20, as Dr. Long said, there would be some eyewitness to this effect. And the most you have is the bar owner, Edelman, who said, well, he certainly wasn't overly intoxicated seven minutes before the accident. Seven minutes before the accident. Now let's take a look at the accident. And this goes to approximate loss and also, I'm going to lastly argue, extraordinary circumstances. You have an undeniable dark, dark road. The officer who arrived at the scene was there a full 15 to 20 minutes before he even knew there was another vehicle involved. Before he knew there was even another vehicle involved. All he had was a dead body on the road. And he was there 10 to 15 minutes. He didn't know until the second cop arrived, there's another car. And in the car, of course, was the baby. It's midnight. It's dark. The neighbor who first came out, Gary Posh, says all the street lights had been out because it was a construction area. It was dark. He did not see the vehicle until the sun came up. So seven hours later, he didn't see the other car until the sun came up. He answered that on a cross-examination. Most important, you have a lady familiar with the area, coming from work, driving down this road in a vehicle 11 times lighter than the vehicle the defendant was driving. And she says, I was two car lengths before I seen this vehicle. I had to swerve. I barely missed him. And she said, on the route, if I would have sneezed, I would have hit him. She says, I stopped. The man looked at me strangely. I was afraid. I called 911. The 911 call was, please, get here. This man's going to be hit. It's dark. Those are your facts. Less than two minutes later, the defendant comes by and runs over. You say the car wasn't found until later. It was 364 feet away. Is that correct? Yes, it was. And it wasn't even in the street. From the point of impact, it was actually across the other street and into the adjoining embankment. It was so dark, you couldn't see it. I mean, that's the point of that. But even after the contact, apparently there was no skid marks or brake marks by the truck. There was not. Absolutely not. By the truck. No attempt to stop. The victim was not only twice the legal limit drunk, but he was on crack cocaine. That was induced at trial. The reason it was crack is that the other metabolite in the system, Dr. Long testified, yes, he was familiar with that. Yes, there was cocaine in his system. Then when I asked him on cross-examination, isn't it true that this other metabolite is the type of substance that is mixed with cocaine when they ingest it through crack pipes? And he says yes. What does that have to do with the accident here being caused by the defendant and the aggravated DUI? I mean, people who are on drugs are protected. This baby boy wasn't on drugs. No, he wasn't. His baby boy was in the back of the car at midnight while the mother was at home. That's exactly right. What does it have to do? It has to do with placing your vehicle in an unlighted area with money in your pocket and running out of gas. It has to do with his own judgment. He was committing a criminal offense himself. He was driving while intoxicated under both Section 1 and Section 2, under the items of drugs. I thought he wasn't driving. I thought he was not on the street. He was, but it was his vehicle. It didn't run. It didn't have any gas in it. It did not have any gas in it. That's true. So he wasn't driving while, you know, at the time of the accident, he wasn't driving. He was outside the vehicle someplace. Well, Your Honor, actually, that would depend upon where the keys were, sir, and I don't know. In defending DUI clients, the rule of law is that he have control of the vehicle. I know that, but the question is, was he knocked out of the vehicle? Oh, no, sir. So he wasn't even in the vehicle. He was standing behind an unlit vehicle in the middle of the night, behind the vehicle, attempting or had maybe just put gas in the vehicle. He had run out of gas. He had walked to a nearby convenience store, had walked back, and he either had just put the gas in there or was putting the gas in it. That was unclear. I don't know of a case, maybe there is, where someone can stand by a vehicle and be in control and be charged with DUI just standing on the outside of the vehicle. I don't know of any cases. Well, maybe the criminal act was, but certainly you would agree that it's a criminal act to have cocaine in the system since it's an unlawful drug. So he was committing a crime just by standing there with the presence of the cocaine. And, Your Honor, again, just what does that have to do? It has to do with his state of mind because the aggravated DUI statute has an element of negligence to it. So if I'm defending this on a civil case, that, I'm going to bring that. I'm going to show that he put himself and his son in harm's way. You know, the first thing you learn as a child, and to me it was my grandmother's, perhaps her mother, that if you go play in traffic, you're going to get hurt. This guy was not only playing in traffic, he was there in the middle of the night where it's uncontradicted that it was dark, that someone else had almost struck him and had just called 911. The Wall Jasper case cited in the brief is a similar set of circumstances where the court negated the problem because there was a previous incident. And here the previous incident was Kerry Young's testimony that if I would have sneezed, I would have ran. If I would have just sneezed, if I would not have been completely paying attention, driving five miles an hour, I would have ran. I thought she was going 30 miles an hour. She was going 30. 35. 35, yes, sir. That, the statute, the counsel very eloquently cites the legislative history. I don't know if that came from our side or came from her side, but when they changed the statute from a Class IV to a Class II, still a Class II felony, there is a presumption of probation. And in Mr. Eichmann's case, he would be subject to that presumption but for the hybrid here because at 43 years old, the only thing on his record was three traffic violations in his 20-some year driving history. He had nothing else on his record. So under the normal circumstances, in a Class II felony, he would have enjoyed the presumption of probation. This statute changed it. It was Senator Dillard on the floor, states, and explained to the President of the Senate why we want this. He says this is a Mothers Against Drunk Driving advocacy, and what this does is it flip-flops, and that was his words, the burden of proof. It flip-flops the burden of proof, and it mandates the defendant to beg for probation. Thank you, Counsel. Counsel? May it please the Court? Counsel? My name is Sharon Shanahan, and I represent the people of the state of Illinois. There are numerous legal and factual reasons that were presented to the trial court and in the state's brief to this court about why defendants' retrograde extrapolation arguments should be rejected. But there are two, I couldn't decide whether to call these moral or ethical points that I have to point out. Justice Waxman has noted one of them, which it is extraordinarily disingenuous for a defendant to argue that the state shouldn't be allowed to use retrograde extrapolation to calculate the defendant's blood alcohol level with his own actions in fleeing the scene and cowering in his trailer and refusing to come out for hours, despite the police banging on his doors, windows, and everything, and then because of his actions, because of his flight, because of his hiding in his trailer, then the only thing the state can do is take the blood alcohol after he's in custody and then say, you shouldn't be allowed to figure out what my blood alcohol was that many hours ago. I just find that very disingenuous. The defendant caused the very problem he complains of, and I don't think he should be allowed to prevail on any problem that he created. The second point in regard to the reverse extrapolation is that defense counsel fought very hard to have his own expert qualified to testify on retrograde extrapolation. Now, because the finder of fact chose to believe the state's expert on retrograde extrapolation instead of his own, he says, well, retrograde extrapolation shouldn't be allowed at all. And as I noted in my brief, it's sort of like the fox claiming that the grapes are sour. One final point on that issue is that when the defendant's expert testified, he had specifically been found to be an expert on retrograde extrapolation. He did not disagree with a single way in which Dr. Long calculated retrograde extrapolation. To say that Dr. Long did it the wrong way when his own expert, the only thing his expert disputed was that starting point, that .02. He talked about things that might have affected that .02. Now, as noted by this court here this morning, and noted in my brief, Illinois has been accepting retrograde extrapolation for almost a quarter of a century. The first case I found was Cuellar v. Pout in 1988. Not too long ago, in People v. Barham. This court said retrograde extrapolation is permissible if the expert is qualified to testify. In Barham, they found that that expert wasn't qualified. But nonetheless, the opinion clearly states that if an expert is qualified to testify, which Dr. Long was found to be, then this court said that it is permissible. Again, as noted by this court this morning, we don't need to go look and see what Texas thinks about retrograde extrapolation when we have not a case about it, but lots of cases in Illinois that have accepted retrograde extrapolation. Moreover, the Texas case stands as the exception rather than the rule. In my brief, I cited decisions from Arizona, North Carolina, South Carolina, Vermont, California, Louisiana, and New Mexico, as well as a federal court decision that all state that this is a well-accepted method of determining outcall level. Finally, I would note that MATA says there's this range that you can use to the multiplication factor, in essence. The lowest multiplication factor that the MATA court cites is .006. That's lower than what Dr. Long used. But even if you use that number, you still come up with .08. Even using the very lowest factor that the MATA court presented, he's still presumptively intoxicated. Finally, I would note that the trial court found the defendant guilty of driving with the blood out to the level of .08 or higher. The trial court also found the defendant to be driving while intoxicated, which kind of segues me into my second section, which is the evidence of intoxication. Evidence of intoxication does two things. First of all, it supports Dr. Long's conclusion that the defendant's blood out call level was very high. And number two, even if you want to discount Dr. Long's conclusion, there is still overwhelming evidence of defendant's intoxication. And therefore, that finding of guilt would remain even absent of the finding of .08 or higher. We have the testimony of defendant's good friend, Sharon Hildreth. She said that the defendant called her right after he got home. He called her. He said she could tell he'd been drinking. She said he was overly emotional, slurring his words, and he was, and I'm quoting her here, kind of like all over. She said he was not as drunk as she had seen him on prior occasions. Jamie Mitcherson, who was one of the members of the defendant's pool team and had known the defendant for three years, said he never saw the defendant without a drink in his hand. He said that he had never seen the defendant totally intoxicated, but, and again, I'm quoting him here, he had definitely been drinking that night. Mark Adelman, which just as well as you point out, this man is facing a ramshackle action. If he says that he gave alcohol to an obviously intoxicated driver, he's in big trouble. Nonetheless, when asked if the defendant was intoxicated, he said, and again, I am quoting from his testimony, intoxicated, maybe, yeah, he probably had a few drinks. And then he later says that the defendant was not so overly intoxicated to the extent that he wasn't serving. Again, that's a very self-serving statement. And by the way, the defendant doesn't even remember going to this bar. He has no recollection of ever going to this bar. Other evidence of intoxication, he hits this car, he's speeding. By either expert's testimony, he's speeding. He slams into this car, no effort ever to brake or swerve. He pushes it 364 feet. I guarantee you, when you see the pictures in this record of what the victim's car looked like, after it had been slammed into by a tow truck and pushed 364 feet, let me say this. It basically starts at the front and ends at the steering wheel. That's all that's left of that Kia, is the car that he was driving. The defendant said he drove this road regularly. It's his way home from the pool hall, so he should have known it was under construction. Nonetheless, he was, as I said, he was speeding. He has no recollection. He never saw the car, ever. He says he never saw the car. Finally admits that he knew he hit something. He fled the crash at a high rate of speed, drove several miles with the entire front of the tow truck missing. Again, the pictures in the record are quite impressive. I mean, the entire front of the truck is missing. It had no headlights. Now, that's not something a sober person does. Even if it was in, you know, he still has headlights. Flight in and of itself is evidence of guilt. But this truck with no headlights, midnight, it's midnight, and he drives several miles. He admitted to Sharon Hilbert that he was drunk at the time of the crash. He admitted that he blacked out and that he snapped, too, as a result of the crash. As I said, he hid in his trailer until forcibly arrested. Then he denies any knowledge of anything whatsoever. And seven hours after the accident, when they finally got him into the police station and they're talking to him, the report still indicates that the police still smelled alcohol on him. His eyes were red and glassy and he was confused and talkative. Dr. Long testified, referring to something that the defense counsel raised. She said that there was one person at the bar that said she didn't think he was drunk. Well, first of all, she had known him a very short period of time. He was just someone that was on her pool team, so she sees him when he comes to play pool. Moreover, Dr. Long testified that in cases like this, frequently a person can conduct rogue things without any problem. It's when they have to do something unusual and complicated that they cannot handle it. Moving on to the proximate cause portion of this argument, I believe that the case cited and discussed at length in the state's brief, people versus merit, is directly on point there. The merit court, first of all, notes that a person commits aggravated DUI when his driving under the influence was a proximate cause of the injuries, not the sole and immediate cause of the victim's injuries. And that emphasis that I placed on the word A was in his original, in the opinion. Somehow or another, the defendant argues that Mr. Ligon's actions in running out of gas at night on a road without a shoulder and then walking in the dark to get gas was a proximate cause of the crash. The defendant, in his brief and again before this court, makes much of the fact that there were traces of cocaine in Mr. Ligon's system at the autopsy. As you've noted, that baby certainly didn't do anything wrong. Moreover, there was no indication of when this cocaine was consumed and this is something that the trial court just really strongly rejected. Whether or not the defendant had cocaine in his system has nothing to do with whether his actions were the proximate cause of this case. The defendant makes a lot out of the testimony of Callie Yount, who testified that she saw this car and slammed on the brakes and she says, as the trial court pointed out, she did miss it. It cuts both ways. She was sober, she wasn't speeding, she was able, she took evasive action and she was able to avoid an accident. The defendant was drunk, he was speeding, he took no evasive action, he never even saw it. He never attempted to brake, he never attempted to swerve, instead he just plows into this car and pushes it 364 feet. I believe that the defendant has grossly exaggerated Mr. Ligon's culpability. As far as the darkness of the road, Mr. Hound, I believe his name was, who lived across the street from the accident, said that although the streetlights were gone, that there was lighting from the business across the road, so it was not pitch dark. Moreover, another witness, the lady that was parked behind while they were waiting for the train tracks, she pulls around the defendant's vehicle, she's driving down the road, this undeniably dark, dark road, that's how it was presented to the court this morning. She looks in her rearview mirror and she can see the victim carrying the baby. Ms. Pace, who came along right after the accident, saw the wrecked Kia in her peripheral vision. She's looking in front of her at the body, but she also sees the Kia on the bank in her peripheral vision Amber Pace, who was the first person on the scene, she sees the victim's body laying in the middle of the road. A body is a lot smaller than a car. She didn't have any trouble seeing it and stopping. And finally, the Kia was not in the middle of the road. This was a four-lane road. The Kia was as far to the right as it could get. There was no shoulder, so it couldn't get off the road. He's as far away as he can get. You can do what the other people did. Go around, whether you go around slowly, whether you do like Ms. Young does, slam on the brakes, swirl around. There's somewhere to go. And there was a full lane on the other side. Moving on to the sentencing issue. Although trial courts are required to consider probation as an alternative to convictions, as a general rule in DUI cases where there is a death, the statute says that the defendant shall be sentenced to a term of imprisonment unless the court determines that extraordinary circumstances exist and require probation. As I noted in my brief and defense counsel acknowledged this morning, the General Assembly, in the discussion of this case, says that this statutory requirement puts the burden on the defendant to beg why they should get probation if they killed someone in a drunk driving accident. It flip-flops the burden of proof. If you kill somebody while you're driving drunk, the burden ought to be on you to prove why you shouldn't go to jail for causing a death while driving under the influence of alcohol. Now, the only factors the trial court found in mitigation in this case was that the defendant had no prior criminal activity and that the defendant was unlikely to commit another crime. And honestly, I sort of disagreed with that one. But nonetheless, the trial court went on to say, in regard to all of the other factors that defense counsel had argued, that it didn't find much of what you say really results in any mitigation when you review the evidence. Now, the defendant says he did not contemplate that his conduct would cause serious harm, but any time a person consumes several alcoholic beverages and then gets behind the wheel of a vehicle, he should contemplate that his conduct would cause serious harm. And the fact that a mediation causes loss of critical judgment and impairs that judgment does not excuse the defendant's failure to contemplate the results of his actions. In this issue, as in the proximate cause issue, the defendant tries to blame this on the victim and says that Mr. Liggins was chemically challenged with an infant son at a time of night that no infants should be out. Even goes so far as to say that Mr. Liggins intended to conceal himself because he was in all likelihood committing several crimes. As the trial court noted, this was pure speculation. The trial court found it unfathomable that the defendant would argue that the baby should not have been out. Also, the trial court said, and I'm quoting, it certainly can't be that defense is arguing that if a victim of an incident like this is intoxicated, then in some way or another that excuses the behavior of the defendant. I have cited this court in a motion to cite additional authority this court's recent decision in People v. Hill. I felt that this court's language was relevant to this case because the exact same issue was raised in an attempt to blame the victim for the accident or his own death and arguing that he should have gotten probation. This court said, and I quote, defendant's attempt to blame the victim for his own choices on that night are without merit and are not worthy as a mitigating factor. This court found that the defendant's behavioral choices, that is choosing to drink and drive on the evening of the fatal crash, led to the victim's death. This court went on to state the victim did not mandate the actions taken by the defendant. Since it is the trial court's discretion to grant or deny probation, and since the defendant did not even remotely carry his burden of establishing extraordinary circumstances, the trial court properly did not allow probation in this case. For those reasons, we would ask that this court confirm if there are no questions. I believe there are. Thank you, Your Honor. Counsel? I respectfully disagree. There are extraordinary circumstances, and the trial court may not have liked the comments, but I raised two children, and to say that this case is analogous to the Hill case, in that case you had a group of boys hanging around, and one boy was angry at his father. He says, I want to go get drunk. He looks at the other one. He says, let's go get drunk. I'll buy the beer. Okay? So they go. They go in the vehicle, and it's his idea. But they all are mom. They're all acting in concert. He crosses the center line, has a wreck, and kills the boy whose idea it was to get drunk. That's a whole lot different than this. Maybe if the boy who wanted to get drunk would have reached over and grabbed the wheel and pulled him into the lane, maybe it would be close to this. Donald Lavers was drunk and on crack and took his infant son in the middle of the night and put him in harm's way. And I'm sorry. He put him in harm's way? Yes. Eichmann came by and ran him over. He came by and ran him over immediately after someone almost did. Now, obviously the argument is it cuts both ways. Well, she missed him. Why didn't he? Well, when you are traversing in traffic, there are so many variables, such as the weight of the vehicle, the size of the vehicle, all these other things. He put himself in danger. She said, Carrie Hunt says, I couldn't see. It was dark. I'm two car lengths from him before I see him. I had to swerve. If I would have sneezed, I would have ran into him. I was that close. She was a blind witness. She was the state's witness. We cannot overlook that. We are taking a bad result here. Yes, the death of a child is bad. The death of any human being is bad. But we are taking that and we're working back. Why was that vehicle there? That vehicle was there because Mr. Lavers put it there in a dark, dark area. And he was in the middle of the road. He was in the middle of that lane. He was in the middle of the right lane, which was the lane Carrie Hunt was traversing, and it was the lane that Mr. Eichmann was traversing. There's no similarity between that and the Hill case where they crossed the center line and hit. There's no similarity between that and the Marist case. In all those instances, the victim and the defendant was – or not the victim and the defendant. The defendant was probably in the middle. That's not clear. But for Mr. Lavers being in, and I say, in the middle of the road, in the middle of his right-hand traveling lane, in a very, very dark area, the counsel tries to say, well, there is some indication there was light. There's no indication. Amber Pace says that the police officer didn't see the vehicle because it was so dark. She said that on cross-examination. Stephanie, the other gal, says, yes, I did see Mr. Lavers walking, but she doesn't say how far away he is from the car. He might have walked away across the tracks. I don't know where she saw him in the rear view mirror. At some point in time, away from that vehicle, there was light. But in that immediate area, you have the neighbor, Gary Pross, coming out saying it was dark. Who knows more than him? He says all lights were out. Yeah, there was light somewhere across the street, but there was no evidence that it was illuminating this area. In fact, Mr. Pross said, I didn't see the other vehicle until the next morning, until the sun came up. And I just don't want to get around the vehicle was there in harm's way. And why was it in harm's way? And I'm sorry, but it was because of Mr. Lakers. He was not an improvement. He absolutely wasn't. And I think that his own negligence in putting his vehicle against the problems and the cause, and if it doesn't do that, then certainly when you have a first offender with no prior driving record who has this unfortunate incident under the minimal traffic violation that he may have committed, the small amount of speeding, if that is not extraordinary circumstances that would mandate a lesser sentence, then we're not going to have it. The court initially said, Judge Hampton initially said, this extraordinary circumstances only where someone was hurt and they can't serve themselves. So it's like an economics. Well, he, in the subsequent hearing, he says, well, it's more than that. It's that and it's where you have cousins or brothers and sisters, or you're at a wedding party and you kill them. Maybe then that's extraordinary. That may be his interpretation. That very well may be extraordinary circumstances. I think this is a more compelling extraordinary circumstances because of the paucity of the criminal record of the defendant involved and because of where this vehicle was under the circumstances it was placed. Thank you. Thank you, counsel. I appreciate the briefs and arguments. I'm going to take the case under advisement. A very short recess.